53

```
1      A    I know one -- one incident where he got in some
2  serious legal trouble, so there needed to be funds for
3  that, for legal representation.  And I remember that
4  being very expensive.
5      Q    And do you recall that the funds for that
6  actually came from the Schwab account?
7      A    I think so, yes.
8      Q    And when you say there was "serious legal
9  trouble," was Elkin represented by a lawyer in
10 connection with that?
11     A    Peggy handled that legal case; but he was -- I
12 remember the charges.  He was charged with assault with
13 a deadly weapon, which was trying to run over his
14 girlfriend with a car.  I'm not sure -- because I didn't
15 hire the lawyer -- but -- but they worked -- worked out
16 an arrangement with the -- I think with the District
17 Attorney for how to get that case resolved.  I know that
18 process took some time and I know it was expensive.
19     Q    And was that the District Attorney in --
20     A    Atlanta.
21     Q    -- Fulton County, Georgia?
22     A    I think so, yes; either Fulton County or
23 Gwinnett.  I think it might have been Gwinnett, because
24 at that time I think we were living at -- we were living
25 in Sugarloaf by that point, and I think it was when he
```

54

```
1  came home for the summer from Florida State.
2      Q    And you don't have any recollection at this
3  time of how much money was spent for that matter?
4      A    No.
5      Q    Do you know for sure whether it came from the
6  Charles Schwab account?
7      A    I assume, because, again, as I mentioned
8  before, since Peggy was handling that -- those funds,
9  I'm assuming that that's where she was getting the money
10 from.
11     Q    And when you say "very expensive," do you
12 have a -- what -- what do you have in mind?  Is there a
13 particular dollar range that you've got in mind?
14     A    I'm thinking off the top of -- I think the
15 initial retainer was 20,000, I believe, to start with.
16 Seems like I remember that number.  I think that was
17 just the initial retainer for the criminal defense
18 attorney and his team.
19     Q    Okay.  And do you recall whether any other --
20 what -- the range of any other dollar amounts that were
21 incurred?
22     A    I don't.
23     Q    And do you recall who the criminal attorney
24 was?
25     A    I do not.
```

55

```
1      Q    Now, that would have occurred after he was out
2  of high school, so let me go back to the question --
3      A    Yes.
4      Q    -- about what kind of expenses were incurred
5  before he -- or during the time he was in high school.
6           Other than payments that possibly were made for
7  his education --
8      A    (Nods head.)
9      Q    -- out of the Schwab account while he was in
10 high school, are you aware of any other payments that
11 might have been made or could have been made or possibly
12 were made out of that Schwab account while he was in
13 high school?
14     A    I think -- I'm pretty sure he had a -- he had a
15 car when he was in high school.  So I think his mom
16 would have purchased a car for him.  Because there was
17 no bus route to -- to North Springs.
18     Q    Do you recall what kind of car that was?
19     A    It was a Jeep Cherokee.
20     Q    Was there another car that he had before that
21 one?
22     A    I think so.
23     Q    I've seen some reference to it in some of the
24 documents, but off the top of my head I --
25     A    Yeah.
```

56

```
1      Q    -- don't recall it was.
2      A    Yeah, there -- I think there was, but...
3      Q    There was another car before that one?
4      A    I think so, yeah.
5      Q    So during the time he was in high school, there
6  was a first car --
7      A    (Nods head.)
8      Q    -- and then this Jeep Grand Cherokee?
9      A    I think so, yes.
10     Q    And you think that those -- the settlement
11 pro- -- or the Schwab account may have been the --
12     A    Yes.
13     Q    -- source of the funds for purchasing
14     A    Yes.
15     Q    -- those cars?
16     A    Yes.
17          MR. FACKLER:  Careful talking over him.
18          THE WITNESS:  Okay.  Sorry.
19 BY MR. ANDERSEN:
20     Q    And so, aside from the possible use of the
21 funds for education while Elkin was in high school --
22     A    Yes.
23     Q    -- and the purchase of one or both of these
24 cars --
25     A    Yes.
```

1  Q   -- are there any other expenses that you can
2  think of that might have come from the Schwab account
3  during that time?
4  A   I can't think of any off the top of my head,
5  no.
6  Q   Ultimately, when -- let me ask you this
7  question.  After the settlement did you personally pay
8  any expenses on Elkins' behalf?
9  A   Yes.
10 Q   What kind of expenses were those?
11 A   Well, again, as I mentioned, prior to that of
12 course I paid for everything.  And so even up to last
13 year I was still paying.  I was paying the rent.  So to
14 go back and say what specific payments did I make, it's
15 really, really hard to say.  I mean, I've taken care of
16 him since he was six until 40.
17 Q   Did you at any point ever tell him that there
18 was a Charles Schwab account or that there was
19 settlement proceeds from his father's death?
20 A   Yes.
21 Q   When did you tell him that?
22 A   I don't remember a specific time.
23 Q   Do you recall a specific event?
24 A   I do not.
25 Q   Do you recall whether you told him more than

1  A   I can't say for sure.
2  Q   And when you had the discussion with him about
3  the settlement funds when he was 17 or 18 years of age,
4  what did you say to him about the settlement funds?  Did
5  you tell him how much was -- what the amount of the
6  settlement was?
7  A   I -- I really don't remember.  I'm going to be
8  honest.  I just -- just don't remember.
9  Q   Did you tell him the fact that there had been a
10 settlement?
11 A   Yes.
12 Q   Did you tell him that the settlement funds had
13 been put in a Schwab account?
14 A   I don't remember that specifically; but, again,
15 he -- he wasn't -- he was a young -- he was a teenager.
16 He was not the least bit concerned about that.  And by,
17 you know, having raised him, he just wasn't.  He was
18 just doing what teenagers do.
19 Q   And, again, you can't recall where you were or
20 when this was other than the fact that you think he was
21 around 17 or 18 when you had a conversation like this?
22 A   That's correct.
23 Q   Have you had other conversations with him since
24 that time about the settlement funds?
25 A   Yes.

58

1  once?
2  A   I don't remember if we spoke about it at
3  length, and I can hopefully explain why.  My
4  relationship with him was father/son.  And he would
5  always say to me, "Dad, you've been taking care of me
6  all this time.  Just handle it.  Just take care of it."
7  And that's our -- been our relationship up until last
8  year.
9  Q   And when you say "just handle it," what -- what
10 do you mean by "it"?
11 A   Whatever he needed to have, including whatever
12 case he had and whatever settlement there was, his
13 response, especially as a child, I remember being as a
14 young adult, 18, 19 years old -- you know, "Dad," you
15 know, "just handle it."
16 Q   Well, when you say "handle it," do you recall
17 specifically him saying "Just handle the settlement
18 funds"?
19 A   Yes.
20 Q   And do you recall him saying that when he was
21 17 or 18 years age -- of age?
22 A   Yes.
23 Q   Do you recall having a discussion with him
24 about the settlement funds before that?  You said 17 or
25 18.

60

1  Q   What do you recall about those?
2  A   Well, recently he sued me.
3  Q   Well, before that.
4  A   Oh, you mean before that.  No, not really.
5  Q   Do you recall having any discussion with him
6  about his learning from his maternal grandfather that
7  there had been a settlement?
8  A   Only -- only as a result of a lawsuit.
9  Q   Okay.  So he's never said that to you?
10 A   No.
11 Q   Okay.  You haven't had a conversation with him
12 about that?
13 A   No, not that.
14 Q   Have you had any conversation with him at -- at
15 all since he was 17 or 18 about the settlement?
16 A   I don't think so, no.
17 Q   And when you had this conversation with him
18 when he was 17 or 18, do you think it was while he was
19 still in high school?
20 A   I think so, but it could have been college
21 also; it could have been shortly after.
22 Q   Has he ever asked you any questions about the
23 settlement funds?
24 A   I would say -- I would say no.
25 Q   After high school what expenditures do you

1  think were made from the settlement funds?
2     A    I think -- I think general upkeep.  I don't
3  believe Elkin has ever worked a job.  And so it was
4  living expenses, because he did not for sure acquire any
5  student loans or anything like that.  So it was
6  maintenance, living.
7     Q    And, again, are you aware of whether the funds
8  that he used for his general upkeep and living expenses
9  and maintenance came from the Schwab account?
10    A    I believe -- well, other than what I would pay
11  on my own prior to all of that and even after that.  A
12  portion of his life was supported, yes, with
13  the Schwab -- with the Schwab account.
14    Q    And how long did that continue?
15    A    Well, Elkin's, I think, almost 40 now.  It was
16  until -- I guess until he ran out.  And then even -- I
17  mean, I supported him pretty -- pretty much after that
18  because, again, as I mentioned I don't think he's ever
19  worked.
20    Q    Did you have a -- conversations from time to
21  time with Peggy King about how much money was left in
22  the Schwab account, whether funds were available in the
23  Schwab account to pay these general upkeep expenses?
24    A    Not -- not really.
25    Q    Well, if you were going to be asked to pay

62

1  things personally, did -- did you ask, Why am I paying
2  this personally as opposed to coming out of the Schwab
3  account?"
4     A    I didn't ask that specifically because, again,
5  that was my son and -- and my ex-wife.  And I had other
6  children.  I treated him the same as all my children, if
7  they needed something.  So I tried to be there for them.
8     Q    Going back to the college expenses, do you know
9  whether the funds from the Schwab account were used to
10  pay for any of the expenses at FSU?
11    A    I think they were.
12    Q    And what recollection do you have of that?  Why
13  do you think that's the case?
14    A    Because he needed money to pay for college, and
15  that was my -- my understanding of what that was for.
16    Q    Are you familiar with any particular checks
17  that were written out of the Schwab account or any
18  payments that were made out of the Schwab accounts for
19  the FSU expenses?
20    A    Not specifically.
21    Q    Do you know whether any of the expenses from
22  San Francisco Community College were paid out of the
23  Schwab account?
24    A    I'm sure they were.
25    Q    Do you -- and then I'll ask you the same

64

1  question.  Do you have any recollection of any
2  particular checks or any particular expenses being paid
3  out of that account?
4     A    Very specific?  I mean, tuition, room and board
5  while he had an apartment.  I think by that point he had
6  another automobile, so I call it living expenses.
7     Q    As opposed to you paying for them yourself,
8  those came out of the Schwab account?
9     A    Yes.
10    Q    And then at Portland State University -- or is
11  it Portland State College or University?
12    A    I think it's Portland State University.
13    Q    State University.  Are you aware of any of the
14  expenses associated with that coming out of the Charles
15  Schwab account?
16    A    Yes, I'm sure that's where they came from.
17    Q    And just so that we're clear, when you say
18  you're sure they came from that account, do you remember
19  writing the checks for them or seeing the checks for
20  them or seeing the statements showing that the
21  disbursements were made from that account?
22    A    I don't recall that.
23    Q    As we sit here today, can you say for sure
24  that's where they came from?
25    A    I'm sure.

1     Q    And why is that?
2     A    Because that was the only source of funds.  I
3  mean, that's what those funds -- again, my understanding
4  was that was what they were for.  And, again, he wasn't
5  working so -- and we didn't do any loans for college,
6  so -- and his mom wasn't working, so...
7     Q    During the time that the Schwab account was in
8  existence, do you recall discussing with Peggy the types
9  of investments that would be held in that account?
10    A    I do not.
11    Q    So, as far as you're aware of it, it was always
12  cash with some mutual funds?
13    A    I think so.
14    Q    Do you recall offhand what -- and I don't want
15  to ask -- want to ask you offhand.  Do you recall what
16  the mutual funds were?
17    A    I do not.
18    Q    Okay.  Other than FSU, San Francis- -- excuse
19  me.  Other than funds that may have been -- or,
20  excuse me, other than expenses that may have been paid
21  from the Schwab account for school up through high
22  school and then later at FSU, San Francisco Community
23  College, and Portland State university, are you aware of
24  any other educational expenses that were paid out of the
25  Charles Schwab account?

65

1    MR. FACKLER:  Objection to form.

2    You can answer.

3    A    I'm not aware, no.

4    Q    Do you know if -- if Elkin was ever paid any

5  type of a -- an allowance from the Schwab account?

6    A    N- -- I'm -- no, I'm -- I don't think so, other

7  than when he finished Portland State -- again, I --

8  my -- with my son, I don't know of him ever to have

9  worked, other than maybe a year or two that Peggy gave

10  him a job with what she was doing.

11    So I'm assuming -- and I'm not a hundred

12  percent on that, but I'm assuming that throughout most

13  of his life, from Portland State, when he probably was,

14  I don't know, 21 or so, up until 30, 35, she probably

15  was u-s-i-n-g settlement funds to support him.  Because

16  I don't think he went back to college after that until

17  maybe age 38 or 39.

18    Q    There's been some reference to the funds in the

19  Schwab account being transferred to Peggy King at the

20  time of your divorce.  Did that occur?

21    A    My recollection is that when we were divorced,

22  since she was handling it all anyway, I think she just

23  basically continued to handle it.  And it was necess- --

24  not necessarily any need for me to be any more involved

25  in that, because she was primarily responsible for --

66

1  for -- of course, for Elkin, his mom.

2    Q    So, as a result of your divorce, you don't

3  recall the Schwab account being retitled?

4    A    I don't think so.

5    Q    And I think earlier you had said that you

6  thought the Schwab account was open for something like

7  six or seven years?

8    A    Well, again, when we got divorced, I didn't

9  really -- I don't think I received the statements.  I

10  didn't keep track of it.  So I'm not sure when they

11  finished it and when it -- when it ended up, so...

12    Q    When you were last aware of the balance of the

13  Schwab account, what was it?

14    A    Geez.  I -- it's hard to say, I mean, again,

15  since I really wasn't dealing with it on a daily basis.

16  I think probably the most important thing is that -- the

17  only reason I was really on the account is I just

18  happened to have an account at Schwab at the time.  So I

19  really wasn't tracking it or, you know...

20    Q    And --

21    A    I didn't know after the divorce -- I mean, I

22  really wasn't tracking it like my own accounts.

23    Q    Okay.  My question, though, is that you've said

24  from time to time you were aware of what the balance of

25  the account was.

67

1    A    Yes.

2    Q    And my -- my question is, what's your last

3  recollection of what that account was, what the account

4  balance was?

5    A    I think probably, I don't know, 70-, 80,000,

6  something like that.

7    Q    And do you recall approximately when that was?

8    A    Probably I think 2000, 2001, somewhere in

9  there, to the best of my recollection.  That's what --

10  because that's about when we -- well, we separated

11  before we got a divorce, so -- and then we also

12  separated, got back together.  So there was some

13  back-and-forth.

14    Q    So that you might have been aware of it either

15  at the -- prior to your separation the first time --

16    A    Right, exactly.

17    Q    -- or you might have been aware of it when you

18  got back together?

19    A    That's correct.

20    Q    Could have been either of those times?

21    A    Yes.

22    Q    And you got back together in -- when was that?

23    A    Well, let's just say we had a lot of

24  back-and-forth, so...

25    Q    Was there a time that you lived together

68

1  again --

2    A    Oh, yes.

3    Q    -- down in Fort Lauderdale?

4    A    Not in Fort Lauderdale.

5    Q    Where -- where did you live together again?

6    A    No, not in -- I mean, this was prior to the

7  divorce when I lived in Sugarloaf.

8    Q    Okay.  What I -- the question I'm asking,

9  though, is you said that -- and maybe I'm

10  misunderstanding you.  You're saying that there was a

11  time when you separated --

12    A    Yes.

13    Q    -- and then there was a time when you got back

14  together again?

15    A    Yes.

16    Q    Did all of that occur before the divorce, or

17  was there a time after the divorce when you got back

18  together?

19    A    That was before the divorce.

20    Q    Okay.

21    THE VIDEOGRAPHER:  Just to make you aware, I

22  need to do a media change in 20 minutes.

23    THE WITNESS:  Okay.

24  BY MR. ANDERSEN:

25    Q    You said at some point after the divorce the

69

1 statements no longer came to you?

2     A   If they did -- or we may have been electronic

3 by that point. So it's hard to say whether we were

4 getting paper at that point. It may have been

5 electronic-only statements.

6     Q   Okay. Well, regardless of whether they were

7 coming to you -- electronically to you or in the mail as

8 paper statements, was there a time when you stopped

9 getting the monthly statements?

10     A   Yes.

11     Q   When was that?

12     A   Probably -- I'd have to be -- I -- I'd have to

13 guess.

14     Q   Is there a particular event associated with

15 that? Was it -- did you stop getting the monthly

16 statements at the time of your divorce? Was it after

17 that time?

18     A   I would say likely after that time. Because

19 they -- they had all -- she had moved, he had moved, and

20 so they were basically managing their own affairs, other

21 than as his stepfather what I needed to get involved

22 with.

23     But on a daily basis I wasn't living with them

24 or interfacing with them.

25     Q   So did there come a point when, because you

70

1 were not interfacing with them on a daily basis, you

2 caused the statements to be sent to somewhere -- to

3 some- -- to Peggy or to Elkin or anybody else?

4     A   No, I don't think so.

5     Q   So -- so you -- what I'm getting at is, do you

6 recall -- do you actually recall causing the statements

7 to be sent to someone other than you at any point?

8     A   No.

9     Q   Okay. I think you've said that -- that it was

10 your understanding that the settlement funds were to be

11 used for Elkin's education and for his upbringing. Is

12 that generally correct?

13     A   That's correct.

14     Q   And even though Peggy was managing the account,

15 if she had been using the funds for some other purpose,

16 you would have been aware of it; isn't that correct?

17     MR. FACKLER: Objection to form.

18     A   I would not have been aware of that.

19     Q   If you had access to the monthly statements,

20 you could have determined that; couldn't you?

21     A   Yes.

22     Q   And if it was for a purpose other than his

23 education or his upbringing, you could have questioned

24 her about that; couldn't you?

25     A   Yes.

71

1     Q   And do you recall whether she actually had the

2 ability to sign checks or make withdrawals from that

3 account?

4     A   I do not recall the mechanics on the account.

5     Q   And even though the Charles Schwab is largely

6 an online servicing, was there ever any broker or

7 adviser of any kind with Charles Schwab that you worked

8 with regard to any of your accounts?

9     A   I do think Schwab assigns you a representative;

10 but, again, Schwab is a self- -- self-managed brokerage

11 firm. They're not a full -- they were -- at the time it

12 was called a discount broker. And so the difference was

13 you made your own decisions, you know, as opposed to

14 something like a Merrill Lynch.

15     So while they do assign you an account

16 representative, it's similar to having a checking

17 account. And so they assign you a branch manager. But

18 I don't remember there being a specific person that I'd

19 work with directly.

20     Q   Which -- over the years do you recall whether

21 there was a particular branch that you worked with more

22 than any other?

23     A   Well, I lived in Atlanta. And I think Schwab

24 did have a couple of retail outlets. But, again, it was

25 99 percent online. It was rarely that you needed to go

72

1 to Schwab that I remember.

2     Q   Do you recall dealing with any particular

3 Schwab retail outlets?

4     A   I do not.

5     Q   During the -- let me ask you this question. Do

6 you have a financial advisor that assists you with your

7 investments?

8     A   I do.

9     Q   Who is that?

10     A   His name is Michael Mor- -- Mor- -- Morceci.

11     Q   How do you spell that?

12     A   I think it's M-o-r-c-e-c-i. Morceci.

13     Q   And where is he located?

14     A   He is with Fidelity.

15     Q   And how long has he been your financial

16 adviser?

17     A   Probably maybe 20 years.

18     Q   And is he located in Atlanta?

19     A   He is here in Jacksonville.

20     Q   Jacksonville. Okay.

21     Do you know whether Mr. Morceci -- that doesn't

22 sound right. If you spell M-o-r-c-e-c-i -- did I --

23     A   Well --

24     Q   -- misspell it?

25     A   -- Morcici (phonetic). It's something like

73

1  that.

2    Q    Okay.  Do you know whether he ever had any

3  involvement with the Schwab account that we've been

4  referring to in which the settlement funds were -- were

5  invested?

6    A    I'm sure he did not.

7    Q    And why do you say that?

8    A    Because those were -- I -- I didn't have -- I

9  established a relationship with Fidelity at some point,

10 but that never was involving that account, the Schwab

11 account.

12   Q    So, in terms of -- of -- of other accounts, did

13 he -- did you have to inform him of what your general

14 financial condition was and then he advised you with

15 regard to your financial matters?

16   A    Well, Fidelity is -- is also similar to Schwab.

17 You can have as much help or as little help as you want.

18 So they assigned you someone, and then you decide how

19 you want to utilize that person.

20        In general what they do is they use outside

21 financial advisors, if you choose to go that route, to

22 manage your accounts, if you'd like.  And he just

23 oversees your Fidelity relationship.

24   Q    Okay.  Other than the gentlemen at -- at

25 Fidelity that we've been referring to, do you have any

74

1  other financial advisors?

2    A    I have banking relationships.

3    Q    Would you consider those financial advisors?

4    A    Yes.

5    Q    Okay.

6        THE VIDEOGRAPHER:  Ten minutes to media change.

7        THE WITNESS:  All right.

8  BY MR. ANDERSEN:

9    Q    Have any of those banking relationships ever

10 advised you with regard to the fund- -- the settlement

11 proceeds?

12   A    No.

13   Q    There's been some reference to a purchase of a

14 condominium in New Orleans from the Schwab settlement

15 funds.  What do you know about that?

16   A    That -- at least Peggy told me that the last of

17 the funds were used for a condo purchase for Elkin in

18 New Orleans.

19   Q    Do you know approximately when that would have

20 been?

21   A    I think -- I'm not sure.

22   Q    Okay.  Obviously it was after the divorce.

23   A    Yes.

24   Q    Other than what Peggy's told you, do you have

25 any other information about that?

75

1    A    I just remember she probably asked me about

2  probably the mortgage process, but it's hard to say

3  because we communicate on a lot of different things.  I

4  just remember everybody -- and him included -- him being

5  excited about the condo or the town home.  It may have

6  been 2002 or 2003, 2004, somewhere in there.

7    Q    Did you ever see any documents related to the

8  purchase of that town house or condominium?

9    A    I think so.  It's possible I may have had to

10 cosign for it.  That's -- that's possible.  Because I've

11 had a lot of transactions with them over the years, and

12 I sus- -- they may have asked me to cosign, but I don't

13 know that for sure.

14   Q    And do you have a specific rela- -- let me ask

15 you this way.  Do you know whether funds from the Schwab

16 account were used for the purchase of that town house or

17 condominium in the sense that you know it as opposed to

18 having being told about it?

19   A    No.  I was told about it.

20   Q    So you haven't seen any documents such as a

21 check from the Schwab account or wire transfer from the

22 Schwab account or a statement that showed a disbursement

23 from the Schwab account for the purchase of that town

24 house or condominium in New Orleans?

25   A    I don't think so.

76

1        MR. ANDERSEN:  Why don't we take a break, then.

2        THE WITNESS:  Okay.  Very good.

3        THE VIDEOGRAPHER:  Off the record at 12:30.

4        (Break taken.)

5        THE VIDEOGRAPHER:  This begins Media 2, and the

6  time is 12:51.  Back on the record.

7        THE WITNESS:  Okay.

8  BY MR. ANDERSEN:

9    Q    Dr. King, during the break I -- we've

10 rearranged ourselves so that you can see some documents

11 that are on a laptop computer.  And I'll represent to

12 you that these documents are documents that were

13 produced by Charles Schwab in response to a subpoena --

14   A    (Nods head.)

15   Q    -- for any records that they had regarding your

16 Schwab accounts.

17   A    (Nods head.)

18   Q    These documents were received by my office late

19 yesterday.  I reviewed them yesterday evening about

20 8:00 p.m. for the first time.  So we're -- to some

21 degree, we're going to look at these together for the

22 first time because I haven't studied them in detail

23 since that time either.

24   A    Okay.

25   Q    And I'm going to point out to you at the lower,

Pages 77 - 88 (except lines 22-25)
Have Been Removed Due
to Confidential Financial
Information On Which
Plaintiff Does Not Rely

```
21
22      Q    So I'll represent to you all -- these are all
23   of the documents that Charles Schwab has produced as
24   having been retained in their records.  And none of
25   these documents reflect any deposits of -- of any of the
```

89

1   settlement proceeds from the Elkin Simpson death
2   settlement; is that correct?
3       A   That's correct.
4       Q   From the standpoint of -- of your personal
5   record retention, do you keep all -- or do you keep
6   electronic copies of documents?
7       A   I do.
8       Q   Do you have a particular period of time that
9   they go back to?
10      A   To the beginning of computers?
11      Q   So would it be fair to say that when you get a
12  new computer you just move the data over to the next
13  computer?
14      A   It depends.  If it's not a crashed hard
15  drive --
16      Q   Okay.
17      A   -- you know.  It used to be common back then.
18      Q   So your -- your current computer, does it
19  contain financial records?
20      A   Yes.
21      Q   Does it contain any financial records from
22  any -- any Charles Schwab accounts?
23      A   I don't think so, no.
24      Q   Is there any particular reason why it -- it
25  doesn't include the Schwab financial records?

90

1       A   Well, I've long since moved to -- everything to
2   Fidelity.
3       Q   And so when -- when you did that, did you make
4   a conscious decision that you didn't want to keep the
5   Schwab records or --
6       A   Well, they were just I think at least --
7   probably ten years old at least.
8       Q   When's the last time you've seen any of the
9   Schwab records on your computer?
10      A   I think there might be one last $300 in one of
11  those Keogh accounts that you went through.  So that's
12  probably still open.
13      Q   Okay.  As far as the Schwab account that -- in
14  which the settlement proceeds were placed, you mentioned
15  at some point you thought that those might have
16  become -- been sent to you online?
17      A   Yes.
18      Q   Okay.  Do you still have any of those computer
19  records --
20      A   I do not.
21      Q   -- that were sent to you online?
22          And have you -- excuse me.  Pardon me.  And
23  with regard to paper copies, do you have any Charles
24  Schwab paper copies in your possession?
25      A   No.

91

1       Q   Okay.
2           MR. ANDERSEN:  Go off the video now.
3           THE VIDEOGRAPHER:  We're off the record at
4   1:30.
5           (Break taken.)
6           THE VIDEOGRAPHER:  We're back on the record at
7   1:34.
8   BY MR. ANDERSEN:
9       Q   Dr. King, do you have any other -- excuse me.
10  Let me put it this way.  Do you have any financial
11  records of any kind relating to the receipt or
12  disposition of the -- what we've been referring to as
13  the King settlement proceeds?
14      A   I do not.
15      Q   Have you at any time had any records pertaining
16  to the receipt or the distribution of the King
17  settlement proceeds?
18      A   Yes, I have.
19      Q   And what types of records would those -- were
20  those?
21      A   Well, the Schwab statements.
22      Q   Any others?
23      A   Probably some legal correspondence probably
24  from -- from Glover McGhee.  Maybe, I don't know, 20
25  years -- 25 years ago.

92

1       Q   Okay.  Any others?
2       A   I don't think so.
3       Q   Do you still have in your possession -- well, I
4   think this goes without saying.  You said you don't have
5   any of these records at this time.
6       A   That's correct.
7       Q   In terms of legal correspondence from Glover
8   McGhee, do you have any specific recollection of any
9   particular documents?
10      A   No, not specific.  When I was living with
11  Peggy, there was heavy litigation going on.  And so
12  there were tons of law- -- I call them lawyer letters,
13  lots of lawyer letters.
14      Q   Okay.  And do you know what happened to those
15  letters?
16      A   They were probably -- 25 years ago -- probably
17  just thrown away over time.
18      Q   Did you at any time have an intention to
19  distribute the -- the remaining balance of the King
20  settlement proceeds to Elkin King?
21      A   You mean directly?
22      Q   Yes, sir.
23      A   Not -- no.  I don't think -- not directly.
24      Q   For example, when he turned 21 years of age,
25  was there an intention to distribute funds to him at

93

1  that -- any remaining funds to him at that time?
2      A    I would answer that by saying I don't really
3  remember my -- what my intention necessarily was; but my
4  relationship with him was -- I had been providing him
5  with money either with or without the settlement, and so
6  I didn't think of it quite that way.
7      Q    Let me show you what will be marked as Exhibit
8  Number 2.
9          MR. FACKLER:  And, for the record, Don, we
10          didn't get 1.
11         MR. ANDERSEN:  I'm sorry.  Let's do that while
12         we're at it.
13         MR. FACKLER:  Okay.
14         (Plaintiff's Exhibit Number 1 was marked for
15  identification.)
16  BY MR. ANDERSEN:
17     Q    Exhibit number 1 was -- is the notice of your
18  deposition today, Dr. King.
19     A    Okay.  All right.
20     Q    We're just -- we're just going to attach that
21  to the transcript.  Is that --
22     A    Okay.
23     Q    -- all right?
24     A    Yes.
25     Q    Okay.

95

1      A    Okay.  All right.
2      Q    Let me -- have you had a chance to look at it?
3      A    Yes.
4      Q    Okay.  The first two pages are a letter from me
5  to you addressed -- at an address in Gainesville.  Did
6  you ever receive that letter, Dr. King?
7      A    No.
8      Q    Do you rec- -- recognize that address?
9      A    Yes.
10     Q    Okay.  What address is that?
11     A    That is my girlfriend, Judy Smith.
12     Q    And did you from time to time receive mail at
13  that address?
14     A    Every now and then, yes.
15     Q    Okay.  But no one ever provided you a copy of
16  that document?
17     A    Well, I forwarded her that letter you sent the
18  other day.
19     Q    Right.  But at the time it was sent, you didn't
20  see a copy of it?
21     A    No, no.
22     Q    Okay.  And if you go down to the third page --
23  or the fourth page, I believe it is, again, there's a
24  reference to the location at which that letter was
25  delivered.

94

1      A    Well, there's some water there, so I don't want
2  to just put it...
3      Q    Yeah, put it right there in the middle there.
4      A    All right.
5      Q    That's good.
6          I'll hand you what will be marked as Exhibit
7  Number 2.
8          (Plaintiff's Exhibit Number 2 was marked for
9  identification.)
10  BY MR. ANDERSEN:
11     Q    And I'll represent to you that it's a -- an
12  exhibit that is -- consists of a two-page letter, a
13  certified mail receipt, and then two copies of e-mails
14  forwarding the documents regarding the delivery of this
15  letter.  And I'll represent to you that that's what
16  those receipts --
17     A    Okay.
18     Q    -- relate to.
19     A    All right.  And --
20     Q    Do you want to hand it to Mr. Fackler first?
21         MR. FACKLER:  This is what was attached to your
22         mediation statement --
23         MR. ANDERSEN:  Yes.
24         MR. FACKLER:  -- is that correct?  Okay.
25         MR. ANDERSEN:  Yes.

96

1      A    Uh-huh.
2      Q    It's the Gainesville, Florida, address.  That's
3  Ms. Smith's address?
4      A    Yes.
5      Q    Okay.  And then the bottom e-mail is a Federal
6  Express tracking e-mail.
7      A    Uh-huh.
8      Q    And it shows a delivery on that document -- and
9  I'm not looking at it myself, but it looks like it's
10  your Orange Park address; is that correct?
11     A    I was looking here.
12     Q    It's the last document there.
13     A    Yes.
14     Q    And were you residing at -- who -- what address
15  is that?
16     A    I lived there.  That's 1736 Wild Dunes Circle.
17     Q    Okay.  And were you living there at -- on the
18  date that that tracking document shows it was delivered?
19     A    Yes.
20     Q    Is there anyone else who lives at that address
21  with you?
22     A    At that time Judy lived there, and Joe and
23  Forrest may not have been there.
24     Q    So is it your testimony -- and I just want to
25  be clear on this.

97

1    A    Yes.

2    Q    Maybe it is your testimony. But is it your

3    testimony that the first time you ever saw that letter

4    was in the last couple of days preparing for the

5    deposition?

6    A    Yes.

7    Q    Okay. Did anybody ever tell you that any

8    letters had been delivered addressed to you from a

9    lawyer while you were at the Wild Dunes address?

10   A    No.

11   Q    Okay. Prior to the filing of the lawsuit --

12   let -- let me ask you this question. When were you --

13   when did you first learn the lawsuit had been filed?

14   A    When it was left on my doorstep.

15   Q    Okay. And is that the day that the process

16   server was in the car --

17   A    Yes.

18   Q    -- and he saw you while you were out jogging?

19   A    Yes.

20   Q    Okay. It's your testimony that prior to that

21   time you had no information that a lawsuit had been

22   filed against you?

23   A    That's correct.

24   Q    Did you at some point have some discussions

25   either directly or indirectly with Elkin about resolving

98

1    the dispute?

2    A    Yes.

3    Q    And what was that?

4    A    Well, like I said, I -- I've -- I've raised

5    Elkin since he was five, so we have a relationship.

6    Prior to the lawsuit -- Elkin's thing was -- he had an

7    apartment. Well, I had an apartment that I was paying

8    for because my youngest son Joseph King was in New

9    Orleans in college. Him and his mother were living in

10   an apartment. I did not know Elkin was living in that

11   apartment as well.

12        So then Peggy got arrested, and I had to make a

13   decision as to whether I was going to continue to keep

14   Joe in New Orleans by himself. And I elected not to do

15   that.

16        Elkin at the time asked me if I would continue

17   to pay for the apartment and then he would stay there

18   with Joe, and I elected not to do that.

19        And at that time he mentioned that he was

20   preparing a lawsuit against me, and if I would give him

21   $50,000 he would not file it. I told him I wasn't going

22   to do that.

23        And then later my subsequent discussion with

24   him was -- when he called and said, "Dad, I don't know

25   what I was thinking. There's no way I'm pursuing a

99

1    lawsuit against you, but I need for you to help me out."

2        So at that time he needed money for, again,

3    living expenses and car payments.

4        And I said, "Elkin, you're 40 years old now.

5    Enough is enough. You have to start supporting

6    yourself." And I'm assuming he called you back.

7    Q    Did you offer to pay him some amount of money?

8    A    No.

9    Q    Okay. In the course of those conversations,

10   did he ever mention the settlement of his father's

11   claim?

12   A    Yes, that's what he was threatening to sue me

13   about.

14   Q    What, to the best of your recollection, was

15   your conversation with him about the settlement?

16   A    His concern was more about -- the settlement

17   was only a -- for him a peripheral issue. His thing

18   was, "Dad, it's going to cost you at least $50- to

19   $75,000 to defend. You may as well give it to me." And

20   he said, "That's what Mr. Andersen said."

21        And I said, "Well, son, I'm sorry, but I can't

22   agree to that. If I have to spend 50- to $75,000 to

23   defend, that's what I'll do." And he was not too happy

24   about that.

25   Q    Okay. Let me just go back to the question

100

1    about the settlement proceeds.

2    A    Yes.

3    Q    Did he tell you at that time that he had been

4    unaware of the settlement proceeds?

5    A    He did.

6    Q    Did you respond to that?

7    A    Yes.

8    Q    What did you say?

9    A    Asked him what was he talking about.

10   Q    Did you tell him anything else?

11   A    I did.

12   Q    What else?

13   A    I said, "Why are you saying that?"

14   Q    Did you say anything further about that?

15   A    I don't believe we talked much more about it

16   other than to say that that's how he was going to get

17   the lawsuit going. And we talked, I believe, about the

18   statute of limitations and how he had to proceed by

19   saying that he didn't know anything about it.

20   Q    Did he say anything to you that indicated that

21   he had known about it prior to that, prior to learning

22   about it from his grandfather?

23   A    We primarily talked about the lawsuit itself

24   and -- and why he was -- why he was doing it.

25   Q    Okay. I understand that, but my question is a

1  very specific one.

2      A    Sure.

3      Q    Did he say anything to you that in- -- did he

4  say anything to you to the effect that he had known

5  about the settlement proceeds before he learned about it

6  from his grandfather?

7      A    Yes.

8      Q    What did he say?

9      A    Basically that -- that -- "Of course I knew

10 about it, but I can't say that."

11     Q    Did he say anything else about knowing about

12 the settlement proceeds?

13     A    No, I don't think so.

14     Q    Did he say anything about when he learned of

15 the settlement proceeds prior to learning about it from

16 his grandfather?

17     A    He did not.

18     Q    And you'd never had any prior conversations

19 with him about the settlement proceeds?

20     MR. FACKLER:  Objection to form.

21     A    No.

22     Q    Did you have any discussions with Peggy about

23 the lawsuit?

24     A    Yes.

25     Q    What were those discussions?

---

1  know, I'll -- I'll talk to him about it, you know, and

2  try to see if we can get him to be reasonable, so to

3  speak."

4      And she said, "If I can talk to him, will you

5  help him out?"

6      And I said, "Sure, I'll help him out.  I've

7  been helping him out all his life."

8      Q    And then after you had this conversation with

9  Peggy King, did she report back to you af- -- about any

10 further conversations she had with Elkin?

11     A    I think she did say that "He's going to call

12 you because he's -- he's coming to his senses."

13     Q    Just for clarity on the record, when you say

14 "call you," or do you mean me or --

15     A    No.

16     Q    -- do you mean you?

17     A    Call -- call me.

18     Q    That's what I thought.

19     A    Yes.

20     Q    Okay.  Did she say anything more about what

21 he had -- what Elkin had said to her?

22     A    Not really, I mean, other than "He -- he's come

23 to his senses and he realizes that you had nothing to do

24 with taking any money from him, or anything else for

25 that matter, so he's going to drop the lawsuit."

1      A    That Elkin was threatening to sue me if I

2  didn't give him $50,000.

3      Q    Did you initiate that call -- that -- that

4  conversation, or did she?

5      A    Hard to say.  Oh, she would -- I would

6  have had -- she would have had to initiate that because

7  I can't call her because she's incarcerated.

8      Q    So did it come up just in the course of the

9  conversation about something else, or did she call you

10 specifically about the lawsuit?

11     A    Just in conversation.

12     Q    Did you talk with Peggy King about -- well, let

13 me ask you this question.  What did you talk to Peggy

14 King about related to the lawsuit?

15     A    Well, we had a lot of general discussions about

16 "What are we going to do with the kids," making sure

17 they're situated.  We talked at length about Elkin and,

18 you know, where was he going to move now that I wasn't

19 going to continue paying for the apartment.  And, you

20 know, as a mom she was concerned about, you know, being

21 out on the street and, you know, how much I could help

22 him out and those types of discussions.

23     And, of course she would say, "Well,

24 obviously, I know you're not going to want to help him

25 if he's trying -- if he's trying to sue you, but, you

---

1      And he did call me and tell me that.

2      Q    So what -- you say he called you directly?

3      A    Yes.

4      Q    And what did he say?

5      A    Well, he just apologized and said, you know,

6  "Dad" -- well, he calls me Dad.  I mean, he calls me

7  Michael Jordan.  At the time, he was trying to pursue

8  some litigation on the apartment complex that I had

9  because he had been injured there.

10     And he said, "Dad, I -- I know you -- you know

11 how to handle these sorts of things, so I had no idea

12 what I was thinking.  And I -- why would I put Michael

13 Jordan off my team," was his response to me.  So what he

14 would say to me, "It's like, you know, you've been with

15 me all my life so I got to be out of my mind to try to

16 sue you."

17     Q    Did he at that time say he was going to drop

18 the lawsuit?

19     A    He did.

20     Q    Okay.  And did you tell him that you would help

21 him in any way financially?

22     A    Not specifically, no.

23     Q    Well, I mean, specific monthly payments or --

24     A    No.

25     Q    -- periodic payments?  Okay.

1    A    No.
2    Q    And at some point were you aware that -- is it
3  Judy -- what's her last name?
4    A    Smith.
5    Q    -- Smith called my office and left a message
6  about dropping the lawsuit?
7    A    Yes.
8    Q    Were you there when she made that call?
9    A    I don't think so.
10   Q    After you had this conversation with Elkin in
11 which he said he'd come to his senses --
12   A    (Nods head.)
13   Q    -- did you have any further conversations with
14 him about the settlement proceeds, the lawsuit?
15   A    No.  From that point forward, after that --
16 prior to that, of course, we hadn't really been
17 speaking; but after that we spoke quite a bit about this
18 other lawsuit that he was trying to pursue.  And he
19 wanted my advice on that.  And also I needed to be
20 involved because it was my apartment.
21   Q    Did he at some point tell you that he had
22 changed his mind and decided to proceed with this
23 lawsuit?
24   A    Yes.
25   Q    What did he say?

---

106

1    A    Well, he said that -- you know, once he
2  realized I was not going to continue to support him and
3  also because the other lawsuit apparently was thrown
4  out, you know, he said, well, this is his only hope.
5    Q    Okay.  And then did you -- did he say anything
6  further about the lawsuit, or did you just infer from
7  that that --
8    A    No.
9    Q    -- he was going to proceed with it?
10   A    Yeah, I assumed he was going to proceed.  He
11 did tell me prior to that that one of his problems was
12 that he had legal expenses.
13        And I said, "Elkin, I thought you had a
14 contingency case."
15        And he said -- this is when he was telling me
16 he was going to drop the case.  He said, "But can you
17 pay the legal expenses?"
18        I said, "Elkin, I thought it was a contingency
19 case."
20        And he said, "No.  Mr. Andersen says I owe
21 him" -- I forgot how much -- whatever the amount was for
22 expenses.
23        And I said, "No, I'm not paying that.  No way."
24        He says, "Well, I'll just call Andersen and
25 tell him, 'Listen, I'm sorry.  I don't have any money

---

1  for you.'"
2        And I -- I don't know if he did, but that's
3  what I assumed he did.
4    Q    Okay.  And have you talked to him again since
5  about the lawsuit or about the settlement?
6    A    No.
7    Q    Have you talked to him at all --
8    A    No.
9    Q    -- since that time?
10       Have you talked to Peggy King about the lawsuit
11 since that time?
12   A    Not about the lawsuit.
13   Q    Did you talk to her about the affidavit that
14 she provided in support of your position in the lawsuit?
15   A    Yes.
16   Q    Okay.  What was that conversation?
17   A    Well, I told her that we need to submit
18 affidavits as to what our position was or what happened.
19 And she said, "Sure, I'll provide an affidavit."
20       And so because she's incarcerated, I mailed the
21 affidavit to her so she could mail it back to put into
22 evidence, I guess.
23   Q    Did you discuss with her the substance of the
24 affidavit, what it needed to say?
25       MR. FACKLER:  Objection to form.

---

108

1    A    No.
2    Q    Did you discuss with her whether the affidavit
3  needed to say anything about whether Elkin knew about
4  the -- her father -- his father's settlement?
5    A    No.
6    Q    Other than Elkin and Peggy King, have you
7  spoken to any other -- anyone else about the lawsuit
8  other than your attorneys?
9    A    Yes.
10   Q    Who else have you spoken with?
11   A    My two sons; my other two sons, Forrest and
12 Joe.
13   Q    And what have you discussed with them about the
14 lawsuit?
15   A    I informed them that their brother was suing
16 me.
17   Q    Have you discussed with them whether they would
18 be witnesses in the lawsuit?
19   A    Yes.
20   Q    And what has that discussion been?
21   A    I said, "It's likely that" -- well, I told them
22 probably you were going to probably just subpoena them
23 or want to ask them some questions.  And I said, "Just
24 be prepared for that."
25   Q    Did you discuss with them whether they knew

109

1  whether -- let me ask you this question.  Do you know

2  whether either of them knew about the King settlement?

3      A    Yes.  Well, Forrest but not Joe.  Joe was a

4  baby back then.

5      Q    What did Forrest know about the case

6  settlement?

7      A    He knew that Elkin had a settlement, but he was

8  also a really young child so he didn't know any of the

9  details.

10     Q    Did he tell you whether he had ever discussed

11 the settlement with Elkin?

12     A    He didn't really say.

13     Q    Okay.  Other than your two sons and Peggy and

14 Elkin King, have you discussed the lawsuit with anyone

15 else?

16     A    Yes.

17     Q    Who else?

18     A    Her -- her father.

19     Q    And that's Donald Barard?

20     A    Yes.

21     Q    Okay.  And what was your discussion with Donald

22 Barard?

23     A    I notified him that Elkin was filing a lawsuit

24 against me.

25     Q    Okay.  Was that a telephone conversation?

110

1      A    Yes.

2      Q    Did you call him?

3      A    He probably called me.  Or I called him.  I'm

4  not sure which, because I talk to him pretty regularly.

5      Q    What was the -- and did you discuss -- you told

6  him that Elkin was suing you.  Did you tell him what the

7  basis for the lawsuit was?

8      A    Yes.

9      Q    What did you tell him?

10     A    That he's suing me for supposedly taking his

11 settlement money.

12     Q    Did you tell him anything else about the

13 lawsuit?

14     A    I don't think so.

15     Q    Did he have any response?

16     A    Yes.

17     Q    What was that?

18     A    He asked me was he crazy.

19     Q    He asked you if Elkin was crazy?

20     A    Yes.

21     Q    Okay.  Did he say anything other than that?

22     A    Other than -- he tends to go on and on, so he

23 talked about stuff like, "I mean, how was the child

24 supposed to live without you?  I mean, he's never worked

25 a day in his life.  You've taken care of him since he

111

1  was a baby.  He really must have lost his mind."

2      Q    Have you spoken with him more than once?

3      A    Not about that, no.

4      Q    So --

5      A    About lots of -- I mean, lots of other things

6  because he's 86 or something like that now.  And his

7  only daughter, which was Peggy, is not available.  So

8  I'm sort of watching out for him, helping him -- helping

9  him with his affairs.

10          (Coughing.)

11     Q    Pardon me.

12          Do you support him in any way financially?

13     A    I do not.

14     Q    And when you spoke with Donald Barard, did you

15 talk with him about the possibility of providing an

16 affidavit?

17     A    Yes.

18     Q    What did he say?

19     A    "Not a problem."

20     Q    Did you say anything to him about the substance

21 of the affidavit?

22     A    No.  I thought -- I told him you probably were

23 going to contact him for an affidavit or a statement or

24 testimony or whatever.

25     Q    No.  My question was, did you ask him whether

112

1  he would provide an affidavit for you?

2      A    No, no, not for me.

3      Q    Did you tell him that one of the allegations

4  was that he had told Elkin about the settlement for the

5  first time?

6      A    No.

7      Q    You didn't talk to him about that at all?

8      A    No.

9      Q    Okay.  Okay.  Other than the people we've just

10 been referring to, have you talked to others about the

11 lawsuit?

12     A    No.  Oh, Judy.

13     Q    Okay.  That's Judy Smith?

14     A    Yes.

15     Q    Okay.  Now, she's also an attorney; correct?

16     A    She is.

17     Q    Okay.  Did you discuss it with her in her

18 capacity as an attorney for you, or did you --

19     A    No.

20     Q    -- just talk to her as your girlfriend?

21     A    As my girlfriend.

22     Q    Okay.  Did you talk to her about trying to work

23 things out with Elkin and get him to drop the lawsuit?

24     A    No.

25     Q    Okay.  And how was it that she came to make

1  that phone call saying that you'd reached an agreement
2  with Elkin that the lawsuit should be dropped?
3      A    When Elkin called, I told her that Elkin agreed
4  to drop the lawsuit.  And she said, "Well, you probably
5  should notify Mr. Andersen of that."
6          And I said, "Well, I think Elkin's going to
7  call him."
8          And she said, "Well, I think it's protocol that
9  you -- you have to notify him, but," she says, "I'll
10 call and leave him a -- I guess leave him a message or
11 let him know if he needs to contact us or anything like
12 that he can -- he can do that."
13         I think that's what our discussion was.
14     Q    Okay.
15     A    I think that she thought that that's what he
16 was supposed to do.
17     Q    And, as far as the message that she left, you
18 never heard that message?
19     A    I don't think so, no.
20         MR. ANDERSEN:  Why don't we go off the record.
21 I'll review my notes --
22         THE WITNESS:  Okay.
23         MR. ANDERSEN:  -- see if I've got anything
24 else.
25         THE VIDEOGRAPHER:  Off the record at 2:10.

1          THE WITNESS:  Okay.
2          THE VIDEOGRAPHER:  Anything else?
3          (No response.)
4          THE VIDEOGRAPHER:  End of deposition at 2:14.
5          (Witness excused.)
6          (The deposition was concluded at 2:14 p.m.)

114

1          (Break taken.)
2          MR. ANDERSEN:  I think that's all I've got at
3  this time.
4          Thank you, Dr. King.
5          THE WITNESS:  Okay.  All right.  Thank you.
6          THE VIDEOGRAPHER:  We need to go back on --
7          THE WITNESS:  Sure.
8          THE VIDEOGRAPHER:  -- to conclude.
9          MR. ANDERSEN:  Okay.
10         THE WITNESS:  Sure.
11         THE VIDEOGRAPHER:  We're back on the record at
12 2:13.
13         MR. ANDERSEN:  Okay.  I don't have any further
14 questions for Dr. King at this time.
15         THE WITNESS:  Okay.
16         MR. ANDERSEN:  If there are other documents
17 that are produced or some other reason to reconvene
18 the deposition, then we may seek to do that; but we
19 understand we've got to have an explanation or
20 reason for doing that.
21         So I have no other questions at this time.
22         Thank you very much, Doctor.
23         THE WITNESS:  You're welcome.
24         MR. FACKLER:  I -- I don't have any questions,
25 and we'll read it if it's ordered.

116

1                    CERTIFICATE OF OATH
2
3  STATE OF FLORIDA)
4  COUNTY OF DUVAL )
5
6          I, the undersigned authority, certify that
7  FORREST KING, JR., M.D., personally appeared before me
8  on November 12, 2019, 2019, and was duly sworn.
9          WITNESS my hand and official seal on this 17th
10 day of November 2019.
11
12
13
14
      _____
      Teresa S. DeCiancio, RDR, CRR, CRC, FPR, C.C.R.
15    Notary Public - State of Florida
      My Commission expires:  July 17, 2021
16    My Commission No. GG 112765
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATE

1
2
3   STATE OF FLORIDA )
4   COUNTY OF DUVAL )
5
6        I, Teresa S. DeCiancio, RDR, CRR, CRC, FPR,
7   C.C.R., certify that I was authorized to and did
8   stenographically report the deposition of FORREST KING,
9   JR., M.D.; that a review of the transcript was
10  requested; and that the transcript is a true and
11  complete record of my stenographic notes.
12       I further certify that I am not a relative,
13  employee, attorney, or counsel of any of the parties,
14  nor am I a relative or employee of any of the parties'
15  attorney or counsel connected with the action, nor am I
16  financially interested in the action.
17
18       DATED this 17th day of November 2019
19
20
21  _____
22       Teresa S. DeCiancio, RDR, CRR, CRC, FPR, C.C.R.
23
24
25

---

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

1
2
In re:  Elkin King versus Forrest King, Jr.
3  Case Number 3:18-cv-01427-BJD-MCR
   Deposition of Forrest King, Jr., M.D. - 11/12/19
4
   PAGE NUMBER   LINE NUMBER   SUGGESTION/REASON
5
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 Under penalties of perjury, I declare that I have read
   the foregoing document and that the facts stated in it
15 are true.
16 _____
17 DATE              FORREST KING, JR., M.D.
18
19
   cc:  Teresa S. DeCiancio
20       Donald R. Andersen, Esquire
21
22
23
24
25

---

118

1              November 17, 2019
2  Forrest King, Jr., M.D.
   c/o Michael T. Fackler, Esquire
3  Milam, Howard, Nicandri,
   Gillam & Renner, P.A.
4  14 East Bay Street
   Jacksonville, Florida 32202
5
   In re:  Elkin King versus Forrest King, Jr.
6  Case Number 3:18-cv-01427-BJD-MCR
   Deposition of Forrest King, Jr., M.D. - 11/12/19
7
   Dear Dr. King:
8
      This letter is to advise that the transcript for
9  the above-referenced deposition has been completed and
   is available for review.  Please contact our office at
10 (904) 354-4111 to make arrangements to come to our
   office to read and sign or sign below to waive review of
11 this transcript.
      It is suggested that the review of this transcript
12 be completed within 30 days of your receipt of this
   letter (or no later than the trial in this case), as
13 considered reasonable under Federal Rules*; however,
   there is no Florida Statute to this regard.
14    The original of this transcript has been forwarded
   to the ordering party and your errata, once received,
15 will be forwarded to all ordering parties for inclusion
   in the transcript.
16
      Sincerely,
17
18 _____
   Teresa S. DeCiancio, RDR, CRR, CRC, FPR, C.C.R.
19 Hedquist & Associates Reporters, Inc.
20
21 cc:  Donald R. Andersen, Esquire
22 Waiver:
23 I, FORREST KING, JR., M.D., hereby waive the reading and
   signing of my deposition transcript.
24
25 _____        _____
   Deponent Signature           Date